Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 6942 | DATE | 12/12/2001 |
| CASE TITLE | Hartmarx vs. A. Robert Abboud, et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Hartmarx has more than amply established both its entitlement to fees and the amount to be awarded. Accordingly Lincoln is ordered to pay Hartmarx the sum of $99,264 by way of reimbursement for fees and expenses thrust on Hartmarx by Lincoln's Rule-violative conduct. That liability is imposed jointly and severally on the four defendants that have been collectivized as "Lincoln" in this opinion and on Lincoln's counsel. (42-1)(42-2)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 13 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 12/12/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| SN | courtroom deputy's initials | DEC 12 PM 4: 02 | SN | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARTMARX CORPORATION,            )
                                 )
            Plaintiff,           )
                                 )
     v.                          )   No. 01 C 6942
                                 )
A. ROBERT ABBOUD, et al.,        )
                                 )
            Defendants.          )

MEMORANDUM OPINION AND ORDER

After an unduly protracted tug of war finally resulted in the October 15, 2001 issuance of a forthright public release by The Lincoln Company, LLC ("Lincoln"[1]), which corrected its August 13, 2001 press release ("August 13 Statement" or, on occasion, simply "Statement") that had misleadingly spoken of a Lincoln tender offer for the stock of Hartmarx Corporation ("Hartmarx"), this Court dismissed both Hartmarx' Complaint, Lincoln's Amended Counterclaim and this action as having been rendered moot by Lincoln's ultimate backing away from the Statement.[2] What now remains for disposition is the subsequently

---

[1] "Lincoln" is used in this opinion both to designate the entity just referred to in the text and, as a matter of convenience, as a shorthand term (employed as a singular noun) to designate the entire group of defendants comprising that entity and A. Robert Abboud, Spencer Hays and the Tom James Company. Both because any liability imposed here is joint and several and because there is no other reason to differentiate among the several defendants in terms of their responsibility, no confusion should be engendered by that dual usage.

[2] This opinion's reference to "unduly protracted" may seem odd when this action's total existence spanned just about the duration of Noah's flood (40 days and 40 nights) before it ended

filed motion for recovery of a fraction of Hartmarx' attorneys' fees and expenses under a portion of the 1995 Private Securities Litigation Reform Act ("Reform Act," 15 U.S.C. §78u-4[3]) and its incorporation of Fed. R. Civ. P. ("Rule") 11.

### Rule 11(b) Liability

Here is Reform Act §(c)(2)(Reform Act §(c) is captioned "Sanctions for Abusive Litigation"):

> If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

The Reform Act §(c)(3) goes on to provide:

> Presumption in favor of attorneys' fees and costs
>
> (A) In general
>
> Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that

---

by landing on the figurative dry land of Mount Ararat in the form of Lincoln's final grudging disclaimer. But the demonstrated volatility of the public market in Hartmarx stock, coupled with the fallout in the form of the inevitable shareholder derivative actions against Hartmarx triggered by Lincoln's repeated public mischaracterizations before its final release cleared the air, justify labeling Lincoln's conduct as having persisted for an undue length of time.

[3] Citations to that statute will take the form "Reform Act § --," identifying only the subsection involved and omitting the prefatory "15 U.S.C. §78u-4."

2

the appropriate sanction--

> (i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and
>
> (ii) for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

(B) Rebuttal evidence

The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that--

> (i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or
>
> (ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.

(C) Sanctions

If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

As with every potential invocation of Rule 11(b), the focus of this Court's current inquiry is on Lincoln's in-court filings, not its out-of-court statements. But to see whether those in-court filings pass or fail the Rule 11(b) standard of objective

3

good faith, the first step must be to look at the meaning of the out-of-court statement to which Lincoln's in-court filings related--in this instance, that means the August 13 Statement filed with the SEC on a Schedule TO (a photocopy of Lincoln's entire filing, including the Statement, is attached).

There is no gainsaying that the August 13 Statement was materially misleading--not to put too fine a point on the matter, was simply false--in at least two respects (emphasis added):

    1. At that August 13 date, the investor group had not "committed $70 million in cash equity for this transaction."

    2. At the same date the same group had not "arranged financing to cover the purchase, refinance the existing Hartmarx debt and provide for the working capital needs of the Company."[4]

Those representations--more accurately, those misrepresentations--were, it will be remembered, made in the course of a communication to Hartmarx' Chairman and Chief Executive Officer Elbert Hand, the opening gun of which communication was framed as a current "offer to acquire for $4.50 per share cash all of the

---

    [4] Interestingly, although it is really unnecessary to provide precedent to support the common sense and undistorted meaning of the Statement's representation that "we have arranged financing," Hartmarx has called attention to the decision in Schnidt v. Henehan, 140 Ill.App.3d 798, 805, 489 N.E.2d 415, 419-20 (2d Dist. 1986), which confirmed precisely the distinction between an accomplished fact and something to be accomplished that Lincoln and its counsel have struggled to obliterate.

4

Hartmarx common stock outstanding, other than the nearly 5% of Hartmarx shares that we already own"--a transaction that the Lincoln group was unquestionably not in a position to carry out when the August 13 Statement was made and was made public. And understandably in light of the unequivocal nature of the stated "offer" and the related statements just referred to, it is readily understandable why the market immediately responded by jumping the price of Hartmarx stock from its pre-Statement level of a few cents over $2 to a day later close at $3.75.[5]

Throughout the brief history of this litigation Lincoln and its counsel steadfastly refused to own up to their falsehoods, instead attempting to twist the normal objective meaning of the representations in the August 13 Statement by advancing insupportable different meanings of the word "arranged." As this Court has pointed out a number of times, most recently during the course of the brief December 7 status hearing, the bulk of Lincoln's arguments collapse of their own weight when proper attention is paid to the fact that the Statement spoke in the sense of an accomplished fact--of <u>having arranged</u> the necessary

---

[5] What then ensued was an entire series of actions by Lincoln that forced Hartmarx and its counsel to take the litigation steps that now form the predicate for its motion for an award of attorneys' fees and expenses pursuant to the Reform Act and Rule 11(b). Because Hartmarx' submission on the current motion, its October 24 Memorandum of Law (cited "Mem. --"), sets out Lincoln's Rule 11(b) violations so fully and so persuasively, for the most part this opinion will simply refer to those wholly accurate discussions rather than essentially repeating them here.

financing. And it is particularly noteworthy that the emphasis by Lincoln and by its counsel in attempting to change the meaning of the August 13 Statement's phrase that includes the word "arranged" wholly ignores Lincoln's clearly misleading use of the unequivocal term "commitment," which does not even arguably lend itself to such attempted deflection of its normal and unconditional meaning.

Indeed, this opinion's reference (and this Court's prior references) to such normal objective meaning of Lincoln's representations in the August 13 Statement is (and are) unequivocally buttressed by the manner in which the investing public read those representations, as shown by the market's instantaneous reaction. What better proof than the market responses of willing sellers and willing buyers, which reflected no uncertainty of the type that would have been implicit in a very different (and materially hedged) type of statement that "we are in the process of seeking to line up financing that, if we can do that successfully, may enable us to make an offer for Hartmarx' stock"--the kind of iffy statement that Lincoln and its counsel now seek to portray as having been made on August 13?

With the meaning of the August 13 Statement thus not in doubt, the next aspect of the Rule 11(b) analysis calls for an examination of Lincoln's in-court filings to see whether, in speaking of that Statement, they have run afoul of the Rule. And

6

it is plain that such an examination calls for an equally unequivocal affirmative answer to that question. In that respect, Hartmarx filed this action after a number of communications had taken place between the parties for nearly a month, but with no actual tender offer having been made by Lincoln in the interim.

First, Hartmarx' September 17 motion for judgment on the pleadings was a fully justified response to admissions that had been included in Lincoln's September 13 responsive pleading--its initial Answer and Affirmative Defenses, coupled with an initial Verified Counterclaim and Third-Party Complaint--even though those admissions were coupled with Lincoln's objectively frivolous denial of Hartmarx' allegation that Lincoln had not in fact arranged the financing for any tender offer. Then Lincoln swiftly backed away from its own partial admissions by filing a September 19 Amended Answer and Affirmative Defenses together with a Verified Amended Counterclaim and Third-Party Complaint--a revised position that was later essentially undercut by Lincoln's ultimate October 15 press release that occasioned the dismissal of this action. What is critical for current purposes is that Lincoln's September 19 filing, involving a patent violation of Rule 11(b), torpedoed Hartmarx' justifiably filed September 17 motion for judgment on the pleadings, so that Hartmarx' attorneys' fees and expenses in preparing that motion are

7

recoverable from Lincoln.[6]

Hartmarx' next claim is predicated on the work done by its counsel in preparing and submitting a Rule 56 motion for summary judgment. That work was necessitated by Lincoln's continued denial, in its Amended Answer and Verified Amended Counterclaim, that it did not really have the financing to commence and complete a $4.50 per share cash tender offer. As Mem. 8-9 demonstrate, Lincoln's August 13 representation that it had $70 million of equity "committed" to the transaction was a total mischaracterization of the situation not only as of that date but even a month later, as of September 17. Here too Hartmarx' Rule 56 filing was triggered by Lincoln's false statements in its own pleadings, so that once again Rule 11(b) calls for an award of those attorneys' fees and expenses.

Next Mem. 10-12 correctly stake out the same position as to Hartmarx' motion to dismiss Lincoln's Counterclaims and Third-Party Complaints, a motion that was once again attributable to the aspects of Lincoln's pleadings that could not be advanced in the objective good faith demanded of every lawyer and client by Rule 11(b). Once more those violations on the part of Lincoln and its counsel call for an award of the related attorneys' fees and expenses.

---

[6] What has been set out here is covered in greater detail and with accuracy at Mem. 5-8.

8

Finally, Mem. 13-14 speak to Hartmarx' legal efforts undertaken in opposition to Lincoln's October 2 motion to dismiss Hartmarx' Complaint as moot (a motion sought to be based on Lincoln's October 1 announcement that it was withdrawing whatever offer it had previously made). In that respect Hartmarx was compelled to file a response in opposition to that motion because Lincoln's purported "corrective" disclosures had not in fact corrected the misleading impressions created by Lincoln's earlier press releases. In that respect, this Court agreed with Hartmarx during an October 4 motion hearing and compelled Lincoln's counsel to return to the drawing board to generate a truthful full-disclosure public statement instead. Mem. 14 reports the ensuing events and accurately labels Lincoln's original motion to dismiss for mootness as itself based on misrepresentations. That too supports the imposition of Hartmarx' related attorneys' fees and expenses on Lincoln.

## Quantification of the Rule 11(b) Sanctions

Hartmarx has been meticulous in its sanctions request, which seeks recovery for only a fraction of its lawyers' total billing in this litigation.[7] Its request is supplemented by the

---

[7] Just to choose a small example, no request has been included for time devoted by Skadden Arps partner Susan Getzendanner, who was in court from time to time during the proceedings, but who played no active role in the work at issue. More significantly, no reimbursement is sought by Hartmarx for any merits-related lawyers' time that does not have an appropriate hook to a Rule 11(b)-violative filing by Lincoln.

9

declaration of Matthew Kipp ("Kipp"), one of the two Skadden Arps lawyers who carried the laboring oar in the litigation (Donna McDevitt ("McDevitt"), the other lawyer involved, spent almost exactly twice as much time as Kipp). Except for Skadden Arps partner Charles W. Mulaney, Jr. ("Mulaney"), whose involvement must be viewed as no more than a convenience--and not at all a necessity[8]--the *time* spent by Kipp and McDevitt was entirely reasonable.

Lincoln does quarrel with four specific categories of time entries included in Hartmarx' request--items listed at page 19 of Lincoln's November 27 opposition memorandum. It is worth noting that in still another instance of Lincoln's approach to this entire litigation--this time something that is not itself sanctionable, but nonetheless troublesome--Lincoln actually seeks to use those limited objections as a purported basis for denying Hartmarx' fee request in its entirety. But leaving that attempted overreaching aside, this Court has reviewed the challenged items, and it finds Hartmarx' Supp. Mem. 2-5 to be

---

[8] Mulaney's time entries on the Hartmarx application aggregate 9.25 hours at the startling hourly rate of $675, for a total request of $6,333. All of those entries are shown as reflecting his "attention to" this or that. Quite apart from the steepness of such a price for any lawyer's attentiveness (this Court trusts that it is at least equally attentive to its responsibilities, and for a much more modest price tag), Hartmarx' willingness to pay for those services in no way justifies their cost being shifted to its Lincoln adversary in this litigation.

10

fully persuasive as to the recoverability of the time spent on those challenged matters as well.

So the final question is one of the reasonableness of the two Hartmarx lawyers' hourly rates: $510 for Kipp and $440 for McDevitt. Lincoln's essential objection is that those numbers "are above the prevailing market rate" (Lincoln Surreply at 1, citing such cases as Cooper v. Casey, 97 F.3d 914, 920 (7th Cir. 1996), Connolly v. National Sch. Bus Serv., Inc., 177 F.3d 593, 597 (7th Cir. 1999) and Batt v. Micro Warehouse, Inc., 241 F.3d 891, 895 (7th Cir. 2001)). But even though the numbers charged by the Skadden Arps lawyers and paid by Hartmarx might tend to trigger judicial second thoughts on the wisdom of having taken the vows of poverty to go on the bench, Lincoln's challenge on that score is unsuccessful as well.

Lawyers are not fungible. When this Court left the private practice to go on the bench, the hourly rate that it had then been charging to and receiving from its clients (although obviously beggared by the explosion in such rates that has taken place in the intervening two decades) was at or near the very top of the scale then being billed by Chicago lawyers. As such, it would unquestionably have been well off the chart of any generalized survey of average hourly rates. But the <u>relevant</u> market for this Court's services in all areas of practice in which it had demonstrated the desired quality of representation

11

to the satisfaction of its clients was represented by the mutual agreement as to the price of its services reached with those clients. At least in the absence of any indication that such agreements represented an unreasonable decision on the part of the clients, the agreed-upon rate was by definition the proper measure of a reasonable fee.

Just so here. Hartmarx, with the universe of lawyers available to it, has selected the Skadden Arps firm and has paid that firm's fees as billed to cover all legal representation--not just the current litigation (and Hartmarx has paid those fees, not incidentally, without reference to whether it could recapture any part of its payments from its adversaries in this lawsuit).[9] That situation calls--really a fortiori--for application of the principles well articulated by our Court of Appeals in <u>Gusman v. Unisys Corp.</u>, 986 F.2d 1146, 1150-51 (7th Cir. 1993):

> Recall that the objective is to find the reasonable fee for the work. When the lawyers sell their time in the market, the market provides the starting point: the lawyer's hourly rate. <u>Eddleman v. Switchcraft, Inc.</u>, 965 F.2d 422, 424-25 (7th Cir. 1992). Lawyers do not come from cookie cutters. Some are fast studies and others require extra preparation. Some are more nimble

---

[9] By contrast, not one of the Seventh Circuit cases cited by Lincoln and referred to earlier in this section of this opinion involved a fee that had been <u>paid</u> by the client and was then sought to be recouped from its opponent. Instead each case sought to inquire into the general reasonableness of the fee, without that inquiry being informed by any reliable arms-length figure derived from the case at hand itself. Under those circumstances the courts' analysis necessarily had to look to outside evidence as to rates elsewhere in the legal community.

12

> on their feet and apt to achieve better results at
> trial. Some have deeper insight and in a few hours may
> find ways to prevail (or to curtail costly discovery)
> that will elude their colleagues. Clients are willing
> to pay more, per hour, for these better lawyers. A
> $225 per hour lawyer may end up costing less than a
> $150 lawyer for the same result or may produce better
> results for the same total bill. Markets recognize
> these truths; judges must too. Only an assumption that
> all lawyers are identical could support the averaging
> approach, under which all lawyers in a division of the
> court receive the same hourly fee.
>
>     \*       \*       \*
>
> Our recent cases have stressed that the best measure of
> the cost of an attorney's time is what that attorney
> could earn from paying clients. For a busy attorney,
> this is the standard hourly rate. If he were not
> representing this plaintiff in this case, the lawyer
> could sell the same time to someone else. That other
> person's willingness to pay establishes the market's
> valuation of the attorney's services.
>
>     \*       \*       \*
>
> A judge who departs from this presumptive rate must
> have some reason other than the ability to identify a
> different average rate in the community. A judge might
> say, for example, that the lawyers did not display the
> excellence, or achieve the time savings, implied by
> their higher rates. A judge might conclude that the
> plaintiff did not need top-flight counsel in a no-
> brainer case. But no claim along these lines has been
> made.

Accord, quoting Gusman, People Who Care v. Rockford Bd. of Educ., 90 F.3d 1307, 1313 (7th Cir. 1996)("Once an attorney provides evidence of his billing rate, the burden is upon the defendant to present evidence establishing 'a good reason why a lower rate is essential'").

Here there is the best of reasons why no rate lower than the

13

actual Skadden Arps billing rates is "essential": Any such reduction would actually defeat the salutary purposes of Rule 11(b) and Reform Act §§(c)(2) and (c)(3). Anything less would force Hartmarx, the innocent victim of Lincoln's Rule 11(b) violations, to bear part of the expense thrust on Hartmarx by those very violations. Dollar for dollar reimbursement is necessary to make Hartmarx whole for its expenses incurred because of the Rule-violative conduct at issue here.[10]

## Conclusion

With the limited exception of the Mulaney services disallowed by this opinion, Hartmarx has more than amply established both its entitlement to fees and the amount to be awarded. Accordingly Lincoln is ordered to pay Hartmarx the sum of $99,264 by way of reimbursement for fees and expenses thrust on Hartmarx by Lincoln's Rule-violative conduct. And as stated

---

[10] What has been said here should be contrasted with the situation dealt with by this Court, sitting by designation with the Court of Appeals for the Tenth Circuit in Beard v. Teska, 31 F.3d 942 (10th Cir. 1994)--a case sought to be called into play by Lincoln's Surreply at 2. There the specialized area of representation engaged in by the lead counsel for whose services a fee award was sought had no relationship to the same counsel's work in other litigation matters that he sought to characterize as establishing his customary hourly rate. After this Court had made a point similar to one articulated here ("But just as lawyers are not fungible, so too legal services are not fungible"--id. at 956), it looked instead to the generally prevailing hourly rates for services of the type at issue in the litigation there. That scenario is of course starkly different from the situation here, where both Skadden Arps lawyers are well-versed in securities litigation and in the types of issues presented by this case.

14

earlier, that liability is imposed jointly and severally on the four defendants that have been collectivized as "Lincoln" in this opinion and on Lincoln's counsel (because this Court has no way of knowing the extent to which the offending court filings are ascribable to the clients or to the lawyers or both). For the reason just stated, this Court leaves to the parties liable how they may apportion responsibility among themselves for the amount of the sanction.

                                                  */s/ Milton I. Shadur*
                                          Milton I. Shadur
                                          Senior United States District Judge

Date:   December 12, 2001

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

---

SCHEDULE TO
(Rule 14d-100)

TENDER OFFER STATEMENT UNDER SECTION 14(d)(1) OR 13(e)(1)
OF THE SECURITIES EXCHANGE ACT OF 1934
(Amendment No.   )

Hartmarx Corporation
(Name of Subject Company (Issuer))

The Lincoln Company LLC
(Name of Filing Persons (Offeror))

Common Stock
(Title of Class of Securities)

417119104
(CUSIP Number of Class of Securities)

Spencer Hays
c/o Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street, 27th Floor
Baltimore, Maryland 21202
(410) 332-8573
(Name, Address and Telephone Numbers of Person
Authorized to Receive Notices and Communications on Behalf of Filing Persons)

## CALCULATION OF FILING FEE

| Transaction Valuation | Amount of Filing Fee |
|---|---|
| N/A | N/A |

Check the box if any part of the fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

Amount Previously Paid:_____    Filing Party:_____

Form or Registration No.:_____    Date Filed:_____

☒  Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

Check the appropriate boxes below to designate any transactions to which the statement relates:

☐ third party tender offer subject to Rule 14d-1.
☐ issuer tender offer subject to Rule 13e-4.
☐ going-private transaction subject to Rule 13e-3.
☐ amendment to Schedule 13D under Rule 13d-2.

Check the following box if the filing is a final amendment reporting the results of the tender offer:   ☐

155255
1855.1

CONTACTS: Robert D. Siegfried & Hope Sidman
Kekst and Company
(212) 521-4800

# HARTMARX CORP. RECEIVES OFFER OF $4.50 PER SHARE CASH FOR ALL OF THE COMPANY'S OUTSTANDING COMMON STOCK

## -- Offer Represents a 137% Premium to Friday's Closing Price for Hartmarx's Shares --

**New York, New York – August 13, 2001** – An investor group headed by The Tom James Company, a leading apparel manufacturer and marketer, today sent the following letter from Spencer Hays, Chairman of Tom James, to Elbert O. Hand, Chairman and Chief Executive Officer of Hartmarx Corporation (NYSE:HMX), and to each member of the Hartmarx Board of Directors offering to acquire all of Hartmarx's outstanding common stock for $4.50 cash. The all-cash offer represents a 137% premium to Friday's closing stock price for Hartmarx's shares of $1.90 per share.

August 13, 2001

Mr. Elbert O. Hand
Chairman and Chief Executive Officer
Hartmarx Corporation
101 North Wacker Drive
Chicago, IL 60606

Dear Mr. Hand:

Over a year ago, we firmly expressed to the Board of Directors and to you our strong interest in purchasing Hartmarx at a substantial premium to market value. We made clear both to the Board and you our keen desire to meet and discuss a proposed transaction. We, therefore, were surprised that, without any attempt at discussion, the Board rejected our proposal and any discussion about it.

While the Board's posture at that time appears to us to have been clearly contrary to the best interests of Hartmarx shareholders, our determination to acquire the Company remains firm, even though Hartmarx's financial and operating results and, in turn, shareholder market value have continued to lag the industry and disappoint shareholders. The credit rating agencies, too, have recognized the Company's deteriorating circumstances.

<u>Accordingly, we offer to acquire for $4.50 per share cash all of the Hartmarx common stock outstanding, other than the nearly 5% of Hartmarx shares that we already own. This price represents a 137% premium above Friday's Hartmarx closing price of $1.90 per share, or approximately a $77 million premium to Hartmarx stockholders. It also represents a 100%</u>

155255
1855.1

<u>premium over the twenty-five day average closing price of $2.25 per share, or about a $67 million premium.</u>

Based on the middle estimate of $0.18 per share for Hartmarx's 2001 earnings by Merrill Lynch, the only securities firm that publishes on Hartmarx, our offer price is more than a 25 times multiple.

Our <u>offer is a win for Hartmarx shareholders</u>, providing an immediate 137% all cash premium to Hartmarx's current stock price. It is <u>a win for Hartmarx and its businesses</u> through a combination with highly successful and knowledgeable people with a proven track record. It is <u>a win for Hartmarx employees</u>, many of whom will be able to benefit economically from our offer because of their participation in Hartmarx's ESOP and retirement plans and will have the opportunity of working in an organizational environment that is characterized by business growth.

As you know, my associates and I operate businesses with combined annual revenues today of between $400-$500 million. Included in this group are such premium apparel brands as Tom James, Kenneth Gordon, Individualized Shirts, Oxxford Clothes, Gitman & Company, H. Freeman & Son, Inc. and English American Tailoring Company.

The Hartmarx Board of Directors must recognize that discontent and disappointment with Hartmarx not only are reflected in its substantial loss of shareholder value, but also in the disenchantment of many who have been close to and involved with the Company for years.

Among other things, the Board knows that A. Robert Abboud, when he was Chairman of its Executive Committee, agreed to meet with us last August after we expressed our interest in acquiring Hartmarx but was forced by Hartmarx at the last moment to cancel the meeting. Mr. Abboud has since left the Hartmarx Board on which he served for over 26 years. Having subsequently met with us to learn about the benefits of Hartmarx being part of our group, he is now an investor with us in our offer.

In assessing Hartmarx's value, we note that the Company's Board of Directors approved this past April a surrender program for stock options with a strike price above $5.63 per share. It is our belief that Black Sholes, the standard and customary valuation methodology for determining the value of options, would assign the worth of those options at between 25% and 35% of the strike price of the option. This means that the option would be worth at a minimum $1.41 per share. Subtracting this value from the $5.63 per share strike price produces a shareholder value of $4.22 per share. As such, the Board appears to have placed a value on Hartmarx which is below our offer price. Moreover, if, as declared in Hartmarx's 2001 proxy statement, these options are to be based on the market price of the stock on the date of issuance and that price is less than both the amount of our offer as well as the amount that the Board has attributed to a base value, then we and every other shareholder of Hartmarx have the right to be concerned that the Board is handing Hartmarx's management a bounty for poor performance.

The Lincoln Company LLC, which is the investor group we have assembled, is made up of The Tom James Company and other investors, who have committed $70 million in cash equity for this transaction. In addition, we have arranged financing to cover the purchase, refinance the existing Hartmarx debt and provide for the working capital needs of the Company. Our offer is

155255
1855.1

subject to our performing limited due diligence of Hartmarx beyond its present publicly available information, Hartmarx Board approval of our offer, including the waiver of the Company's poison pill rights plan, HSR clearance and completion of a definitive agreement.

We want to assure you that the due diligence will be done in a manner that will not be disruptive to Hartmarx's operations and will be at our sole expense. <u>Our intention and commitment are to work together with the Hartmarx Board in completing a transaction designed to serve the best interests of Hartmarx, its shareholders, employees, customers and suppliers</u>. Since Hartmarx is a publicly traded company and to avoid rumors, we feel it is necessary to make this offer public so that there is accurate information in the marketplace.

We view time as of the essence in this matter and are prepared to meet with the Hartmarx Board immediately to move forward with this transaction. We look forward to hearing from you so that such a meeting can be arranged.

Sincerely,

/s/ Spencer Hays

Spencer Hays
The Lincoln Company LLC


Investors and security holders are strongly advised to read the business combination statement regarding the offer referred to in this press release when it becomes available because it will contain important information. The Lincoln Company LLC will file this statement with the Securities and Exchange Commission (SEC) at the appropriate time. Investors and security holders may obtain a free copy of the statement (when available) at www.sec.gov.